# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

MATTHEW ALPER,             )

                      Plaintiff,   )

      v.                  )

                            )

DEAN HAMER and RANDOM HOUSE, INC. )

                         )

                  Defendants. )

------------------------------------------------------

Civil Action No.

**JUDGE CASTEL**

**07 CV 2934**

RECEIVED
APR 12 2007
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

Plaintiff Matthew Alper, by his attorneys Schweitzer Cornman Gross & Bondell LLP as and for his complaint against the Defendants Dean Hamer and Random House, Inc., hereby alleges as follows:

## PARTIES

1.    Plaintiff Matthew Alper ("Alper") is an individual residing at 826 President Street, Brooklyn, NY 11215.

2.    Defendant Dean Hamer ("Hamer") is an individual with a business address c/o National Institutes of Health, Building 37, Room 6002, 9000 Rockville Pike, Bethesda, MD 20892-4255.

3.    Defendant Random House, Inc. ("Random House") is a New York corporation with its principal place of business at 1745 Broadway, New York, NY 10019.

## JURISDICTION AND VENUE

4.      This court has subject matter jurisdiction over the federal causes of action under 28 U.S.C. §1331; §1338(a); and §2201(a).

5.      This court has personal jurisdiction over Random House as, upon information and belief, Random House engages in systematic and continuous activity in the State of New York; transacts business in the State of New York; and has committed acts of infringement complained of herein in the State of New York.

6.      Venue is proper in the Southern District of New York under 28 U.S.C. §1391.


## Alper's Highly Regarded Work in the Field of Neurotheology

7.      Alper is a pioneer in the field of Neurotheology, the study of the genetic and neurophysiological origins of man's spiritual and religious beliefs.

8.      In the mid-1990's, Alper conducted extensive research into a possible biological basis for man's belief in a spiritual realm and in god.

9.      Alper's research formed the basis of a book he authored *The "God" Part of the Brain* which was first published in 1996 ("Alper's Book").

10.      On June 24, 1997, Alper obtained U.S. Copyright Registration No. TXu-805-559 for Alper's Book.

11.      Alper's Book is especially notable because it offered a novel and comprehensive approach to the origin of man's spiritual and religious beliefs from a genetic and evolutionary perspective.

12.    Alper theorized in his book that humans are genetically "hardwired" to believe in a spiritual realm and a god or gods.  Alper postulated that this "God part of the brain" evolved in humans as a coping mechanism for the purpose of enabling humans to survive their unique and otherwise debilitating awareness of their own mortality.

13.    Alper's Book is a seminal work in the field of Neurotheology and has had a very strong impact on this emerging field of study.

14.    Alper is self taught in the field of Neurotheology and is the only expert without a PhD or MD degree to be cited in *Neurotheology*, the <u>first</u> published anthology in the field of Neurotheology.

15.    Since the publication of Alper's Book, Alper has received substantial media recognition.  Alper has been cited in articles in the Washington Post and New Jersey's Star Ledger.  His book was discussed on "Larry King Live" and Plaintiff has been the guest on numerous radio shows including appearances on "Coast to Coast AM with Art Bell", WBAI's "Exploration with Dr. Michio Kaku," Fox News Radio with Alan Colmes, among many others.

16.    Alper has delivered numerous lectures in Neurotheology throughout the U.S. including lectures at the University of Minnesota, University of Arizona, and New York University.

17.    Alper's Book has been adopted by numerous colleges including Vanderbilt, Union, Mary Washington, Texas A&M, and Pepperdine, as a source for teaching classes in the "Psychology of Religion," "Philosophy of Religion," and "Sociology of Religion."  In 2001, a conference was sponsored by Utah State University titled "The 'God' Part of the Brain" which was attended by approximately two hundred college professors.

18.     Alper's Book has received recognition and praise from leading scholars in the fields of Neurophysiology, Genetics, and Evolutionary Sciences including William Wright, Andrew Newberg, Dr. Fuller Torry, and Edward O. Wilson, a two time Pulitzer prize winner and preeminent evolutionary biologist.

19.     Alper initially self published his book in paperback in 1997 and promoted the book through media appearances and lectures leading to initial sales of more than 12,000 copies.  To date the paperback version of his book has sold approximately 30,000 copies.

20.     Alper's Book is presently published by Sourcebook's Inc. in a hardcover edition.

<u>Hamer Obtained Access to Alper's Book and</u>
<u>Announced Plans to Write on the Subject of Neurotheology</u>

21.     Defendant Dean Hamer is a geneticist who is the Director of the Gene Structure and Regulation at the U.S. National Cancer Institute (part of the National Institutes of Health).  He has a PhD degree from Harvard Medical School.

22.     Hamer is the author of several books including *The Science of Desire* and *Living with Our Genes*.  Both of these books are about the influence of genes on human behavior.

23.     Upon information and belief, on or about the beginning of July 2000, Hamer received a copy of Alper's Book.  Prior to accessing Alper's Book, Hamer never mentions religious or spirituality as part of our genetic heritage in his published works.

24.     On July 3, 2000, Hamer, writing for the online magazine slate.com, posted an entry in his "diary" or blog (the "Slate Article") that he was working on a new book tentatively entitled *The God Gene*.   A copy of the Slate Article is attached as Exhibit A.

25.    In the Slate Article, Hamer copied the main premise of Alper's Book to support his conclusion that there is a neurological basis for the spiritual belief in god. Hamer copied several expressions directly from Alper's Book in the Slate Article.

26.    Hamer's queries on Page 2 of the Slate Article included:

"Why do so many of us **believe in** something **we cannot see, smell, hear or touch**?" (emphasis added)

Whereas page 80 of Alper's Book contains the following expressions:

"Though there is no physical evidence to support the existence of a spiritual reality, every culture has believed in one.  This is rather unusual for a species of skeptics as ourselves.  Unless we can **see, feel, taste, smell, hear or touch something, we tend to be dubious of its existence.**" (emphasis added)

27.    In the Slate Article, Hamer also stated;

"**Religion** certainly has many of the properties of **genetic traits**.  It's remarkably **constant across all cultures**." (emphasis added).

The back jacket of Alper's Book contains the following expressions:

"From the dawn of our species, **every culture** has believed in a **spiritual reality**, Wouldn't this imply that **spirituality** must represent a **genetically inherited trait**?" (emphasis added).

28.    After Alper learned of the Slate Article and was struck by the very strong similarity of Hamer's Slate Article to Alper's Book, Alper contacted Hamer by e-mail to confirm that Hamer had read Alper's Book.

29.    In an e-mail dated July 5, 2000 (the "July 5 E-mail"), Hamer stated that "he read [Alper's] book th[at] weekend."  Hamer stated that Alper's Book "was very interesting and [he] enjoyed the sense of personal exploration that came through so clearly."  Hamer then asked Alper if there have "been any new developments [in the field] you are aware of?

I am particularly interested in 'hard' data like brain scans, genetic analyses and so on." A copy of Hamer's e-mail is attached hereto as Exhibit B.

30.    While Hamer had previously written extensively about the influence of genes on behavior in his two published books and otherwise, Hamer had never mentioned spirituality or religion as part of our genetic heritage.  The first time Hamer discussed human spirituality as being influenced by genes was in the Slate Article which was written days after Hamer read Alper's Book.

31.    The July 5 E-mail demonstrates that Hamer had read Alper's Book and that he gave it significant attention.  It also demonstrates that Hamer was relatively new to this particular field of study, Neurotheology, and recognized that Alper was more knowledgeable of this field at the time Hamer announced his intentions in the Slate Article to publish a book with an identical premise as that of Alper's Book.

Defendants' Infringing Book

32.    In 2004, Defendants' Book entitled *The God Gene: How Faith is Hardwired into our Genes* was published by Co-Defendant Random House, Inc.'s Doubleday division (the "Defendants' Book").

33.    Defendants' Book was substantially similar to Alper's Book through Defendants' copying of the expression of many ideas in Alper's Book and passing them off as his own original work.

34.    Defendants' Book contains an extremely large number of passages which are substantially similar to or clearly paraphrased from those found in Alper's Book. Through these actions, Defendant Hamer copied the unique analysis, style, treatment

and characterization of the subject matter contained in Alper's Book.  Hamer also copied the structure of the material in Alper's Book and the topical sequence.

35.    Alper's expressions appear in Defendants' Book.  In Alper's Book, Alper characterized a human's biological predisposition to believe in god as being "hard-wired".  This characterization is not a common scientific term.  Instead it is a product of Alper's own style and manner of expression.  On Page 80 of Alper's Book, Alper wrote that "Humankind is **'hard-wired'** to believe in a spiritual reality."  (emphasis added).  On page 81 Alper wrote that "[t]he human species is **'hard-wired'** to believe in a spirit world."  (emphasis added).

36.    In the subtitle of Defendants' Book, Hamer used the same unconventional expression with the following prominently displayed tagline: "How faith is **hardwired** into our genes" (emphasis added).

37.    In Defendants' Book, Hamer in many instances copied the specific wording of Alper's expression of his ideas.

38.    Page 109 of Alper's Book contains the following expression:

**"The mystical experience** has **certain characteristics common to all faiths**." (emphasis added).

Page 83 of Defendants' Book copied it as follows:

"In the **mystical experience** there are **certain** fundamental **characteristics that are universal** and **not restricted to any particular religion or culture**. (emphasis added).

39.    Page 129 of Alper's Book contains the following expression:

 "**Psychedelic drugs** have been used to stimulate **religious experience  since the dawn of history** ... The **ancient Aztecs**...referred to **peyote** as the "divine messenger..." (emphasis added).

Page 81 of Defendants' Book copied it as follows:

"**Psychoactive plants** have been used for **religious purposes for centuries** ... The **peyote** cactus whose main active ingredient is mescaline was used by the **Aztecs**." (emphasis added).

40.    Page 62 of Alper's Book contains the following passage:

"Are our **beliefs in a god**, a soul an afterlife the consequence of a **genetically inherited instinct**." (emphasis added).

Page 6 of Defendants' Book paraphrased it as follows:

"**Spirituality** is one of our basic human **inheritances**.  It is, in fact, an **instinct**." (emphasis added).

41.    Page 132 of Alper's Book contains the following passage:

"**More recent estimates** propose that the **human genome** is comprised of a much **smaller number** than had **previously been speculated** and is closer to **approximately 34,000 genes as opposed to 100,000**." (emphasis added).

Page 58 of Defendants' Book copies this passage as follows:

"From the **human genome sequence** we know that our DNA has roughly **35,000 different genes**...That's a **surprisingly small number**, far fewer than **previous estimates of 50,000 to 150,000**." (emphasis added).

42.    Hamer also took Alper's expressions of ideas from numerous places in Alper's Book and distilled or otherwise combined them using nearly identical words.

43.    Alper's Book contains the following passages on pages 98, 100, and 77, respectively, wherein Alper characterized humans' awareness of their own mortality as part of the adoption of spirituality genes:

"Living with the certain knowledge of imminent death leaves us in a state of perpetual **mortal dread**." (emphasis added)

"And so, with this one cognition, the most powerful creature on earth was suddenly **incapacitated by a crippling awareness of its own inevitable death**."  (emphasis added)

"Moreover, the religious impulse not only fosters the group dynamic, but it also **provides the individual with a necessary sense of purpose**." (emphasis added)

On p. 143 of Defendants' Book, Hamer uses identical language lifted directly from Alper's Book and characterizes this issue as follows:

"I believe our genetic predisposition for faith is no accident.  It provides us with a **sense of purpose** beyond ourselves and **keeps us from being incapacitated by our dread of mortality**.  (emphasis added)

44.    Alper wrote on page 77 of his Book:

"I would like to make the **important distinction between two separate** human impulses: one of **religiosity**, the other of **spirituality**."  (emphasis added)

Hamer deliberately copied Alper's Book and claims these expressions as his own work on page 10 of Defendant's Book when he wrote:

"**One of my greatest challenges is to attempt to separate spirituality from religion**." (emphasis added)

45.    Hamer copied many other specific expressive elements in Alper's Book and incorporated them into Defendants' Book.  For instance, in Alper's commentary on the subject matter, Alper created analogies that are unique to Alper's Book and not, by any means, an intrinsic part of this field.  Hamer directly copied many of these analogies for his book.

46.    On page 186 of Alper's Book, Alper made the following analogy in discussing humans' reluctance to replace religious beliefs for scientific findings:

"**In prior times**, it was considered blasphemy to believe that the earth revolved around the sun. (emphasis added)

In Defendants' Book, Defendant copied Alper's unique analysis by using

9

the exact analogy to explain the identical idea.  On page 209 of Defendants' Book, Defendant wrote:

> **"In the sixteenth century, the church taught that the sun circled the earth; astronomy proved it to be the other way around."** (emphasis added)

47.    In Alper's Book, Alper used epileptics as evidence of a link between neurophysiology and religious experiences.  Alper focused particularly on Dostoyevsky to describe religious feelings experienced by epileptics and wrote as follows:

> **"Dostoyevsky,** who himself suffered this form of **epilepsy,** offered a description of this experience in his book The Idiot: **"I have really touched God. He came into me, myself; yes, God exists, I cried. You all, healthy people can't imagine the happiness which we epileptics feel during the second before our attack."**  (emphasis added).

Defendants copied the same Dostoyevsky analogy to express a similar point.  On page 133 of Defendants' Book, Defendant wrote:

> **"His {[Dostoyevsky's]** interest in **mystical experiences** may have resulted from his **epilepsy,** which is documented in statements by his physicians, several biographies and his own voluminous writings." 'I have really touched God. He came into me, myself; yes, God exists, I cried. You all, healthy people can't imagine the happiness which we epileptics feel during the second before our attack.'"** (emphasis added).

48.    On page 154 of Alper's Book, in characterizing religious behaviors, Alper wrote of Islamic dancing as an example, namely:

> "Like the **Islamic whirling dervishes** who **spin** themselves into an **ecstatic frenzy**..." (emphasis added).

In the Defendants' Book, Defendants copied Alper's passage almost verbatim.  On page 130 of Defendants' Book, Defendant wrote:

"The **whirling dervishes** half chant, half shout the name of **Allah** as they perform their **swirling**, leaping **ecstatic dance**." (emphasis added).

49.    In Alper's Book, to demonstrate that every culture has created religious works of art, Alper wrote:

"[t]he first examples of this exist in the form of **cave paintings** which date as far back as to man's early Paleolithic age, from about **40,000-12,000**". (emphasis added)

On page 4 of Defendants' Book, Defendant copied the same expression in the following manner:

"More than **30,000 years ago**, our ancestors **painted** the walls of their **caves**...." (emphasis added)

50.    In Alper's Book, to demonstrate the biological basis of spirituality, Alper discussed other behaviors that are a consequence of genes and biology. Alper specifically chose to discuss musical abilities and its association with particular parts of the brain to analyze this topic. Plaintiff's analysis follows:

"Similar to a linguistic aphasia, musical aphasias constitute the loss of some specific musical ability caused by physical damage incurred to one's brain. For example, after suffering a stroke, a **composer may lose his ability to write music**; a musician, his ability to play an instrument." (emphasis added).

Defendant Hamer copied Alper's expression and made a nearly identical analysis utilizing the same analogy chosen by Alper - human musicality  - as opposed to the multitude of other human behaviors that are well known to have a genetic basis, to express the same thought with similar wording and structure. Pages 130-131 of Defendants' Book contain the following passage:

"[After suffering a stroke] The Russian composer Vassarian Shebalin **completely lost his ability** to speak and to understand speech **but kept right on composing**. Even more remarkable is the fact that individuals who

have **lost their musical ability** continue to show an emotional response to music. One woman, whose brain was damaged during surgery **became musically incompetent**. She could **no longer sing or even recognize a simple tune** like "Mary had a little lamb." (emphasis added).

51.    Defendants' Book has passages where Alper's writing style was copied by closely copying or paraphrasing Alper's expressions and merely changed one element to avoid a verbatim copying of Alper's expression.

52.    Alper used the following passage to describe that music can produce physiological effects in humans which demonstrates it has a genetic component:

> "How about the fact that **music can affect us physiologically**? Music can provoke **intense, genuine, emotional arousal** from ecstatic happiness to a flood of tears. Equally revealing is the fact that, regardless of one's cultural origins, all peoples tend to interpret certain musical themes in the same way. Who, for instance, and from what culture, **would ever describe a John Philip Sousa march as soothing or tranquil, as opposed to militant, triumphant, or exhilarating**?" (emphasis added).

On page 130 of Defendants' Book, Hamer copied the structure, analysis, and words of Alper's Book in this passage and merely substituted the musical composer. Hamer's passage is as follows:

> "**Musical rhythms** can actually **alter brain activity** ... **Excitative music, such as the 4th movement of Tchaikovsky's Fourth Symphony**, caused more **excitation of the body and the brain than did sedative pieces** like the third movement of **Mahler's Sixth Symphony**." (emphasis added).

53.    Alper's Book on page 55, in characterizing innate behavior, stated as follows:

> "How about the fact that **all dogs bark or all cats meow**? Take a kitten away from its mother, for instance, and **raise it in total isolation**, and **it will still meow**, suggesting that meowing is an **inherited reflex**." (emphasis added).

Defendant copied this passage and simply switched the analogy from a cat to a bird.  Page 7 of Defendants' Book recites:

> "That the song is at least partly *innate* can be seen by its species specificity: **All male white-crowned sparrows sing, even when they are separated from their parents after two weeks and *raised in complete isolation* of any other birds.**" (emphasis added)

54.   Another instance of Hamer's copying Alper's Book by closely paraphrasing Alper's analysis while maintaining the structure, organization and character of Alper's expression involved Alper's characterization of the negative consequences of religion.  On p. 182 of Alper's Book, Alper provides his own viewpoint on the subject:

> "If we were to recognize that our religiously generated fears and antipathies are merely the effects of an inherited impulse, we might be able to curb this same impulse that has launched our species into a **history of repeated religious war. How many more times must we justify acts of cruelty, murder, and genocide in the name of God and religion before we learn to tame this destructive impulse in us?"**  (emphasis added).

Hamer copied this passage at page 215 of Defendants' Book:

> **"Historically, religion has at times helped to usher in wars, crusades, and jihads...Are we condemned to endlessly repeat the sad mistakes of our past?**"  (emphasis added).

55.   Alper discussed skepticism at page 80 in his book as follows:

> "...Though there is no physical evidence to support the existence of a spiritual reality, every culture has believed in one. This is rather unusual for a species of skeptics as ourselves...Unless we can **see, feel, taste, smell, or hear something, we tend to be dubious of its existence.**" (emphasis added).

Hamer used an identical characterization to discuss skepticism:  At page 6 of his book, Hamer wrote:

"Why is spirituality such a powerful and universal force? Why do so many **people believe in things they cannot see, smell, taste, hear or touch?**" (emphasis added).

56.    In Alper's analysis of the personal nature of perception in his book, Alper wrote:

"It's not just the different species that perceive and interpret reality from their own unique perspectives but also each individual within each species .... Because each **individual perceives the world from his own unique perspective, each of us must consequently maintain our own unique interpretation of reality.**" (emphasis added).

Hamer closely copied Alper's expression at p. 92 of Defendants' Book where he wrote:

"The third key feature of **consciousness is that it is personal.  It is yours and yours alone.**  You can describe to people how you see or how your feel but the sights and feelings are not transferable.  This is **why you always experience the world from your own viewpoint, not from the perspective of somebody else.**" (emphasis added).

57.    On p. 77 of Alper's Book, Alper wrote:

"it's possible for a person to be highly religious though completely aspiritual. Inversely, **it is equally possible for someone to be highly spiritual, though not at all religious.**" (emphasis added).

On p. 10 of Defendant's Book, Defendant copied this expression as follows:

"**Even individuals who dislike all forms of organized religion may have a strong spiritual capacity.**" (emphasis added).

58.    At p. 114 of Alper's Book in his discussion of the behavior of epileptics as evidence of a biological basis for spirituality, Alper wrote:

"Jeffrey Saver and John Rabin of the UCLA Neurologic Research Center found historical documentation to suggest that a **significant number of the world's spiritual prophets and leaders were sufferers of temporal lobe epilepsy**. The list they composed included, among others, such notable religious figures as **Joan of Arc, Mohammed, and the apostle Paul**." (emphasis added).

At p. 131 of Defendants' Book, Hamer copied Alper's expression and

wrote:

"What did **the apostle Paul, Muhammed the prophet, Joan of Arc and Fyodor Dostoyevsy have in common**? All of them were intensely religious. All of them had mystical visions. And now some scientists think that all of them may have **owed at least part of their intense feelings of spirituality to temporal lobe epilepsy**." (emphasis added).

59.    On page 42 and page 13 in Alper's Book, Alper wrote:

"how was it possible that this multitude of **data we absorb through our sense organs** could so spontaneously arrange itself in such a way as to yield **coherent information** to us? How is it that **this vast stream of stimuli we are constantly being bombarded** with all manages to fall into place in such an intelligible manner?" (emphasis added).

"When we eat an apple, we "**feel**" its texture; we "**smell**" its aroma; we "**taste**" its flavor.   Not until we integrate all of these various sense-impressions is our experience transformed into a **coherent perception of the apple as a whole**." (emphasis added).

On pages 90 and 91 in Defendant's Book, Hamer copies this expression:

"Our brains are **bombarded** with information every second of every minute. There is the data we receive from the outside world through our **senses: sights, sounds, smells, tastes and touches**." (emphasis added).

"My brain is no computer.   And yet it receives, sorts, processes, and analyzes this incredible volume of data with the greatest of ease to produce the most remarkable of all products: **a seemingly coherent picture of the world around me**." (emphasis added).

60.    At p. 73 of Alper's Book, Alper discussed the universal belief in the

afterlife as follows:

> "This universal belief in an afterlife is physically manifest in the cross-culturally enacted funerary or burial ritual. In this universal practice, the deceased's body is disposed of with a rite that anticipates **sending that individual's spirit on to some next or other realm**. As further physical evidence, many cultures **bury their dead** with **artifacts meant to facilitate the deceased person's transition from this realm to the next**..." (emphasis added).

> At p. 4 of Defendants' Book, Hamer copied this expression by writing:

> "These early humans **buried their dead** with **elaborate preparations for an afterlife. Sometimes they equipped them with food and supplies for their journey**." (emphasis added).

61.    At p. 34 of Alper's Book, Alper discussed natural selection and passing on

genes, writing:

> "Those creatures **whose variations are best suited or adapted** to their surroundings are **at a considerable advantage and are therefore more likely to survive**. Those forms more likely to survive will, in turn, have a **greater chance of reproducing**. Those that have **a greater chance of reproducing** will, consequently, **have a greater chance of passing their genes, along with their advantageous traits, on to future generations**." (emphasis added).

> At p. 140 of Defendants' Book, Hamer's copying:

> "**At every step, the genes that helped their owners survive and reproduce were most likely to be passed onto the next generation**." (emphasis added).

62.    The back jacket of Alper's Book reads:

"**From the dawn of our species**, every culture–no matter how **isolated**–has maintained a belief in some form of a spiritual reality." (emphasis added).

On Page 4 of Defendants' Book, Defendant copied this as follows:

"[the capacity for spirituality] has been evident throughout recorded history **in every civilization and culture, in every nook and cranny of the globe** … *Homo sapiens* have had spiritual beliefs **since the dawn of our species**." (emphasis added).

63.    Page 94 of Alper's Book contains the following passage:

"**As the human brain is larger and more complex** than that of all the other species, our cognitive capacities are that much more sophisticated. First of all, **our brains contain much more storage space**, enabling us to retain a great deal many more memories." (emphasis added).

Page 163 of the Defendants' Book contains the following copied passage:

"Part of the reason for the difference is that **humans have larger brains than animals, allowing them to store more information**." (emphasis added).

64.    Page 118 of Alper's Book contains the following passage:

"One of the chief components **underlying self-awareness** involves something called **"autobiographical" memory. Autobiographical memories are those that pertain to one's personal sense of identity**." (emphasis added)

Page 93 of Defendants' Book contains the following copied passage:

"This is what incorporated the **autobiographical me into my perception of the world around me. It involves the ability to recognize one's own acts and feelings**." (emphasis added).

65.    On the back jacket of Alper's Book and p. (i) of Alper's Book, Alper wrote:

"A cogent and engaging exploration into the **biological foundations of spirituality**" (emphasis added).

"a provocative introduction to speculations concerning **the neural basis of spirituality**." (emphasis added).

Page 2 of Defendants' Book includes a copy, namely:

"... **a biological basis of spirituality**" (emphasis added).

66.    At page 66 of Alper's Book the following appears:

"According to the Pulitzer prize-winner E.O. Wilson,'Religious belief is one of the universals of human behavior, taking recognizable form in every society from hunter-gatherer bands to socialist republics. Its rudiments go back, at least, to the bone altars and funerary rites of Neanderthal man."

Page 141 of Defendants' Book contains a copy:

"In his groundbreaking book *On Human Nature*, Wilson lays out the evidence that the predisposition to religious belief has a genetic basis. There is evidence of religious belief more than 60,000 years ago among Neanderthal man.    In fact, it is universal; every society, from hunter-gatherers to postindustrial democracies, has had some form of spiritual belief."

67.    In Defendants' Book, Hamer copied the unique structure, topical sequence, and organization of the material in Alper's Book. Defendants' Book has many instances where subject matter was divided into similar chapters to those of Alper's Book. In these instances, Hamer only slightly altered the title of the chapter in attempting to disguise his wholesale copying of Alper's work.

68.    Chapter One [part two] of Alper's Book is entitled **The Spiritual Function**. Chapter One of Defendants' Book is entitled **Spiritual Instinct**. Both chapters discuss the same topics.

69.    A sub-chapter of Chapter One in Alper's Book is titled **Universal Spiritual Beliefs and Practices**. A sub-chapter of Chapter One in Defendants' Book is titled **A Human Universal**. Both chapters discuss the same topics.

70.    At page 78 of Alper's Book, Alper wrote:

"Our universal spiritual/religious proclivities represent an inherent characteristic of our species, a genetically **inherited** trait. This would mean that we're innately **predisposed** to believing in a spiritual reality." (emphasis added)

Hamer divided Alper's analysis into chapter three of his Book and titled it

**An Inherited Predisposition**.

71.    At page 112 of his book, Alper wrote:

"Offering physical evidence to validate this notion, Andrew Newberg and Eugene D'Aquili at the Nuclear Medicine division at the University of Pennsylvania used SPECT (single positron emission computed tomography) scans to observe changes in the neural activity of Buddhist monks."

Hamer divided Alper's analysis into a sub-chapter of Chapter 7 in his book

titled **This is Your Brain on Zazen** and Hamer discussed identical subject matter.

72.    At page 134 of Alper's Book, Alper wrote:

"The **University of Minnesota**, which conducted its own twin **study**, concluded that "Studies of twins raised apart suggest that 50 per cent of the extent of our religious interests and attitudes are determined by our genes."

Defendants' Book has a sub-chapter titled **The Minnesota Experiment** which is

about the identical subject matter.

73.    Page 119 of Alper's Book, he wrote:

"Meanwhile, Michael Persinger used a machine called a transcranial magnetic stimulator (a helmet that shoots a concentrated magnetic field at **a specific region in the brain**) to excite different regions within his own brain. In support of Ramachandran's work, when Dr. Persinger used the device to stimulate his own temporal lobe he experienced what he described as his first feelings of "being at union with God."

Defendants' Book has a sub-chapter beginning on page 135 titled **The God Spot** which dealt with the same subject matter.

74.     At page 140 of his Book, Alper wrote:

"Our **faith healer** who, though he is incapable of performing miracles, he is very adept at tapping into one's prayer function, thus allowing such psychosomatically ill individuals to vent their excess anxieties through the evocation of prayer.  By invoking the prayer function, the **Faith Healer** is really just facilitating a cerebral catharsis in someone who is stricken with excess anxiety.  In this way, the Faith Healer works like a placebo."  (emphasis added).

Defendants' Book has a sub-chapter containing the same subject matter titled **Faith Healing**.

75.     Page 77 of Alper's Book contains a lengthy footnote discussing the distinction between religiosity and spirituality.  Page 10 of Defendant's Book contains a subchapter titled **The Difference Between Spirituality and Religiousness** which contains identical subject matter.

76.     Hamer was interviewed by Time Magazine.  In the interview, Hamer recited passages from Alper's Book and such passages were published in an article in Time Magazine without attribution or recognition of Alper's contribution and which further increased Defendants' reputation and fame to the detriment of Alper.

77.     Upon information and belief, Hamer's copying of Alper's Book has resulted in significant sales of Defendants' Book, widespread media attention for

Hamer, and has allowed Hamer to earn significant income for speaking engagements on the copied subject matter.

## FIRST CLAIM OF RELIEF

### (Copyright Infringement)

78.    Alper realleges and incorporates by reference the allegations contained in paragraph 1 to 77 as if fully set forth herein.

79.    Alper owns the entire right, title and interest in and to Alper's Book.

80.    Alper's Book contains literary work which is original and a proper subject of copyright.

81.    Defendant Hamer had access to and copied portions of Alper's Book. Defendant Random House published, distributed, sold, and promoted the infringing book.

82.    Defendants' conduct has been in willful violation of Alper's exclusive rights to Alper's Book.

83.    Defendants' unauthorized copying is a violation of Alper's exclusive rights under the copyright laws, as enumerated in 17 U.S.C. §101 et seq., and constitutes copyright infringement.

84.    As a direct and proximate result of the conduct of Defendants, Alper has been damaged in an amount to be determined at trial.

## SECOND CLAIM OF RELIEF

(False Designation of Origin)

85.    Alper realleges and incorporates by reference the allegations contained in paragraph 1 to 84 as if fully set forth herein.

86.    Defendants falsely designated the origin of Defendant's Book in violation of 15 U.S.C. §1125(a) by affirmatively misrepresenting the book as arising solely from Defendant Hamer and not attributing credit to Alper when Alper's copyrighted work formed a substantial portion of the Defendants' Book.

87.    The false designation of origin by Defendants has caused consumer confusion over the source of the Defendants' Book.

88.    As a direct and proximate result of the conduct of Defendants, Alper has been damaged in an amount to be determined at trial

**WHEREFORE**, Alper respectfully requests that the Court:

1.    Declare that Defendants' unauthorized conduct violates Alper's rights under the Copyright Act;

2.    Order a full and complete accounting of all income, expenses, profits and other pertinent information directly or indirectly related to the Defendants' Book;

3.    Order that Defendants account to Alper for Defendants' profits arising from the foregoing acts of copyright infringement and false designation of origin;

4.    Award Alper his actual damages sustained as a result of Defendants' copyright infringement and false designation of origin;

5.      Award Alper his costs, including, reasonable attorney's fees and disbursements in this action as provided in 17 U.S.C. §505; and

6.      Grant such other relief as is deemed just and proper in the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury pursuant to the Federal Rules of Civil Procedure, Rule 38.

April 11, 2007                          SCHWEITZER CORNMAN GROSS & BONDELL LLP
                                        Attorneys for Plaintiff
                                        292 Madison Avenue
                                        19th Floor
                                        New York, NY  10017
                                        Telephone:  (646) 424-0770
                                        Facsimile:  (646) 424-0880

                    By                  _____
                                        Michael A. Cornman (MC 7134)
                                        Elliot W. Lipins (EL6151)